**United States District Court**
*DISTRICT OF DELAWARE*

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

|  |  |
|---|---|
| ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | ) |
| | ) |
| **Wilmington, Delaware 19806** | ) |
| | ) |

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case No. 07- 205 M

**FILED UNDER SEAL**

```
F I L E D

NOV  1 9  2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE
```

I,    Patrick M. McCall                                    , being duly sworn depose and

say:    I am a(n)    Special Agent, ICE              and have reason to believe that

_____ on the person of or   X   on the property or premises known as (name, description and/or location)

See Attachment A, which is incorporated herein by reference,

in the _____ District of      Delaware

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B, which is incorporated herein by reference,

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rule of Criminal Procedure):

property that constitutes evidence of the commission of a criminal offense, the fruits of crime and things criminally possessed and property designed and intended for use and which has been used as a means of committing a criminal offense, to wit, violations of 18 U.S.C. §§ 2252 and 2252A (receipt and possession of child pornography).

The facts to support a finding of Probable Cause are as follows:

See attached affidavit of Patrick M. McCall, which is incorporated herein by reference.

Continued on the attached sheets and made a part hereof.   X   Yes    ____ No

*[signature]*

**Signature of Affiant
Special Agent Patrick McCall, ICE**

Sworn to before me, and subscribed in my presence

October 22, 2007                              at      Wilmington, Delaware
**Date**                                                **City and State**

**Honorable Leonard P. Stark
United States Magistrate Judge
District of Delaware**
**Name and Title of Judicial Officer**

*[signature]*

**Signature of Judicial Officer**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

IN THE MATTER OF THE SEARCH )
OF THE RESIDENCE LOCATED AT: )
                             )
███████████████████████      )    Case No. 07-
                             )
Wilmington, Delaware 19806   )
                             )    **FILED UNDER SEAL**
                             )

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Patrick M. McCall, being duly sworn, depose and state the following:

1. I am a Special Agent with United States Immigration and Customs Enforcement

("ICE"), an investigative branch of the United States Department of Homeland Security. I am a

federal law enforcement officer authorized by the Secretary of Homeland Security to request the

issuance of search warrants. I have been employed as a Special Agent for ICE and its

predecessor agency, the United States Immigration and Naturalization Service ("INS"), for

approximately twenty years and am currently assigned to the Resident Agent in Charge Office in

Wilmington, Delaware. I was previously assigned to the ICE/INS Philadelphia Office of

Investigations for approximately eighteen years, where my responsibilities included conducting

investigations into various types of federal crimes, including crimes involving child

pornography. I have received training from ICE and another of its predecessor agencies, the

United States Customs Service, regarding child pornography, the sexual abuse of children, the

behavior of preferential child molesters and how to conduct investigations of child sexual

exploitation and obscenity crimes. As part of my work on these cases and in these training

1

courses, I have observed and reviewed numerous examples of child pornography (as that term is defined in 18 U.S.C. § 2256) in all forms of media, including computer media. In the course of my investigative duties, I have also had contact, in the form of interviews and meetings, with preferential child pornographers and those involved in the distribution, sale, production and possession of child pornography. And I have assisted in the execution of numerous search warrants relating to investigations of child pornography crimes.

2. This affidavit is submitted in support of an application for a search warrant for the residence of John E. MANNING, located at ███████████████████████████████

██████████ Wilmington, DE 19806 (the "Subject Premises") and the computer(s) located therein, for evidence of violations of Title 18, United States Code, Sections 2252 and 2252A ("Section 2252" and "Section 2252A"). The Subject Premises is more fully described in Attachment A.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence of violations of Section 2252 and Section 2252A is presently located at the Subject Premises.

## RELEVANT STATUTES

4. This investigation concerns alleged violations of Section 2252 and Section 2252A, relating to material involving the sexual exploitation of minors.

2

5. Sections 2252 and 2252A prohibit a person from, *inter alia*, knowingly transporting, receiving, or distributing child pornography in interstate or foreign commerce, by any means including by computer, or from possessing child pornography that has been transported in interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6. The following definitions apply to this Affidavit and Attachment B to this Affidavit:

7. "Child pornography" means any visual depiction of sexually explicit conduct where (a) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (b) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (c) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. *See* 18 U.S.C. § 2256(8).

8. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

9. "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

10. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. *See* 18 U.S.C. § 2256(2).

11. "Internet Service Providers" ("ISPs") are commercial organizations which provide

3

individual and business customers a range of capabilities, such as access to the Internet and access to other functions including web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs offer customers various means by which they can access the Internet, such as (a) through the use of a "dial-up" system whereby the customer accesses the Internet via a telephone line; (b) broadband-based access, whereby a customer accesses the Internet via a digital subscriber line ("DSL") or cable television line; (c) access to the Internet via dedicated circuits; or (d) a satellite-based subscription that provides Internet access. ISPs typically charge the customer a fee based upon the type of connection the customer chooses to employ and the volume of data (or "bandwidth"), that the connection supports. Many ISPs assign each subscriber an account name (often referred to as a "user name" or "screen name"), an e-mail address and an e-mail mailbox. The subscriber, in turn, typically creates a password that allows for restricted access to the account. Therefore, by using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system and can then access the Internet by inputting his or her account name and password.

12. "Domain Name" refers to the common, easy to remember names associated with an Internet Protocol address ("IP address"). For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically: (a) ".com" for commercial organizations; (b) ".gov" for governmental organizations; (c) ".org" for organizations; and (d) ".edu" for educational

4

organizations. Second-level domains will further identify the organization, as, for example, "usdoj.gov" further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each domain is uniquely identifiable. For example, "www.usdoj.gov" identifies the world wide web server located at the United States Department of Justice, which is part of the United States government.

13. "Log Files" or "logs" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events, including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

14. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

15. A "website" consists of textual pages of information (called "web pages") and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

16. "Uniform Resource Locator" or "Universal Resource Locator" or "URL" is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains (a)

5

the name of the protocol to be used to access the file resource; (b) a domain name that identifies

a specific computer on the Internet and (c) a "pathname," which is a hierarchical description that

specifies the location of a file in that computer.

17. The terms "records", "documents", and "materials", as used herein, include all

information recorded in any form, visual or aural, and by any means, whether in handmade form

(including, but not limited to, writings, drawings, paintings), photographic form (including, but

not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures,

photocopies), mechanical form (including, but not limited to, phonograph records, printing,

typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings,

cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard

disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi

Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory

calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts

or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND REGARDING SEIZURE OF COMPUTERS

18. Based upon my knowledge, training and experience, as well as the experience of

other law enforcement personnel, I know that searches and seizures of evidence from computers

commonly require agents to seize most or all of the items that relate to that computer (including

hardware, software and instructions) to be processed later by a qualified computer expert in a

laboratory or other controlled environment. That is almost always true because of the following:

6

19. Computer storage devices (like hard drives, diskettes, tapes, laser disks, Bernoulli drives and others) store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she may store it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the search warrant. This examination process can take weeks or months, depending on the volume of the data stored, and it would be impractical to attempt this kind of data search on-site.

20. Searching computer systems for criminal evidence is a highly technical process requiring expert skills in a properly controlled environment. The vast array of computer hardware and software available today requires that even computer experts must specialize in some systems and applications. Before a search is conducted, it is difficult to know which expert should analyze the computer system and its data. A search of a computer system is an exacting scientific procedure, which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password-protected, and other encrypted files. Because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

21. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices, as well as the central processing unit ("CPU"). In cases like this one, where the evidence consists partly of graphic files, the computer monitor and printer are also essential to show the nature and quality of the graphic images that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and

7

any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices, to understand how that data was created. Moreover, searching computerized information for evidence or instrumentalities of a crime commonly requires the seizure of the entire computer's input/output peripheral devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment. Peripheral devices, which allow users to enter and retrieve data from stored devices, vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system.

22. In addition to being evidence of a crime, in cases of this sort, there is probable cause to believe that not only the computer, but also its storage devices, the monitor, keyboard, printer, modem and the other system components were all used as a means of committing offenses involving the sexual exploitation of minors in violation of law, and should all be seized on that basis alone. Accordingly, permission is sought herein to seize and search computers and related devices consistent with the scope of the requested search.

## BACKGROUND REGARDING THE INTERNET

23. As previously noted, your affiant has received formal training in the investigation of crimes involving child pornography and the sexual exploitation of children. I also own my own computer, have personal knowledge of the operation of a computer and have accessed the Internet since approximately 1990. Based on this training and knowledge, and the experience of

8

other law enforcement personnel involved in this investigation, I know the following:

24. The Internet is a worldwide computer network that connects computers and allows communications and the transfer of data and information across state and national boundaries. A user accesses the Internet from an ISP, which connects them to the Internet. In doing so, the ISP assigns each user an IP address. Each IP address is unique. Every computer or device on the Internet is referenced by a unique IP address the same way every telephone has a unique telephone number. An IP address is composed of four sets of digits known as "octets," ranging in value from 0-255, separated by decimal points. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISP's employ "dynamic" IP addressing, that is, they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. The ISP logs the date, time and duration of the Internet session for each IP address. It can identify the user of that IP address for a particular computer session from these records, so long as the ISP has retained the records dating back to that time period.

25. Photographs and other images can be used to create data that can be stored in a computer. This storage can be accomplished using a "scanner," which is an optical device that can recognize characters on paper and, by using specialized software, convert them to digital

9

form. Images can also be captured from single frames of video on a computer. After the photograph or other image has been scanned into or captured by the computer, the computer can store the data from the image as an individual "file." Such a file is known an image file. Computers are capable of displaying an image file as a facsimile of the original image on a computer screen.

26. The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy or compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 250 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage on a different computer system in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

27. With Internet access, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer. The process of transporting an image file to one's own computer is called "downloading." The user can then display the image file on his computer screen and can choose to "save" the image on his computer and/or print out a hard copy of the image by using a printer device (such as a laserjet or inkjet printer).

10

28.  Importantly, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. This can occur in various ways.  For example, electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they may be recoverable months or years later using readily-available forensic tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in "free space" or "slack space" -- that is, in space on the hard drive that is not allocated to an active file or that is left unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## BACKGROUND OF INVESTIGATION

29.  In April 2006, Immigration and Customs Enforcement's Cyber Crimes Center, Child Exploitation Section ("ICE/C3/CES") initiated an investigation into a criminal organization operating or controlling numerous commercial child exploitation websites.  The investigation

began with the identification of one such website known as "Home Collection," which was located at http://members.homecollect.us.

30. As set forth more particularly below, the investigation soon revealed that the organization was operating in excess of 200 commercial child exploitation websites, access to which was restricted to those who paid to become "members" of the sites ("member-restricted websites"). The organization solicited customers to pay for access to these member-restricted websites through the use of a number of "advertising websites." When a customer visited these advertising websites, he or she was offered monthly access to a member-restricted website for a fee of between $79.95 and $99.95 per month. The organization then utilized various PayPal[1] accounts to process customer payments for access to the member-restricted websites.

31. From April 2006 through August 2007, ICE/C3/CES conducted over 175 undercover transactions at the advertising websites associated with this investigation, which in turn provided access to approximately 40 different member-restricted websites containing child pornography. Each one of the undercover purchases followed one of the two patterns listed below:

**Pattern One:**

1. The ICE agent accessed a specific advertising website.

2. When the ICE agent clicked on an icon indicating that he or she wished to obtain access to a member-restricted website, the agent was redirected to an "iWest" payment website. That website required that the agent enter personal identifying information, including an e-mail account and credit card information. In addition, the "iWest" payment website

---

According to its website, located at http://www.PayPal.com, PayPal is a company that enables any individual or business with an e-mail address to securely, easily and quickly send and receive payments online, using a credit card or bank account information. It is becoming an inexpensive way for merchants to accept credit cards in their on-line storefronts instead of using a traditional payment gateway. PayPal identifies its accounts by the name of the e-mail address(es) that a PayPal account holder provides to PayPal when registering for the account.

12

identified the specific member-restricted website that the customer was purchasing access to, through the use of a "website identifier" – a name associated with the particular website.

3. After the agent completed the required information and clicked "submit," the agent was redirected to a second web page indicating that the payment was currently being processed. The website also stated that the agent should check the e-mail account the agent had typed into the iWest website and that the agent would receive an e-mail at that address providing further information on how to complete their purchase.

4. The ICE agent next received an e-mail at the e-mail address he or she had typed into the iWest payment website, which contained payment completion instructions. This e-mail included a hyperlink to a PayPal account and it instructed the agent to access that account in order to complete the transaction.

5. The ICE agent completed the transaction by again entering personal identifying information into the PayPal website and ultimately by making a payment to the owner of the PayPal account via credit card transaction. After completing the transaction via the PayPal account, the ICE agent received a receipt from PayPal, which contained an "Item/Product number."

6. The ICE agent then received an e-mail from the organization, which provided the agent with the URL for the member-restricted website the agent had gained access to, as well as password and login information to enable the agent to access the site.

**Pattern Two:**

1. The ICE agent accessed a specific advertising website.

2. When the ICE agent clicked on an icon indicating that he or she wished to obtain access to a member-restricted website, the agent was redirected to an "iWest" payment website. That website required that the agent enter personal identifying information, including an e-mail account and credit card information. In addition, the "iWest" payment website identified the specific member-restricted website that the customer was purchasing access to, through the use of a "website identifier" – a name associated with the particular website.

3. After the agent completed the required information and clicked "submit," the agent was redirected to a second web page that indicated that the payment was currently being processed. The web page also contained a button the agent had to click to complete the payment.

4. The agent clicked the button and was redirected to a secure PayPal payment web page.

13

5. The ICE agent completed the transaction by again entering personal identifying information into the PayPal website and ultimately by making a payment to the owner of the PayPal account via credit card transaction. After completing the transaction via the PayPal account, the ICE agent received a receipt from PayPal, which contained an "Item/Product number."

6. The ICE agent then received an e-mail from the organization, which provided the agent with the URL for the member-restricted website the agent had gained access to, as well as password and login information to enable the agent to access the site.

## IDENTIFICATION OF CERTAIN PAYPAL ACCOUNTS AND CERTAIN MEMBER-RESTRICTED WEBSITES

32. As indicated above, this criminal organization utilizes multiple PayPal accounts to process customer payments for the monthly subscription fees required to gain access to its child exploitation member-restricted websites. PayPal maintains transactional records for each such PayPal account. During its investigation, ICE/C3/CES obtained the transactional records for the particular PayPal accounts the organization used to facilitate customer payments for access to the member-restricted websites. The transactional records include at least the following items for each such transaction: the date of purchase, the time of purchase, the name of the customer, the subject of purchase, the amount of the purchase, the customer's IP address, the customer's e-mail address, the seller's e-mail address, an "Item ID" number and the customer's full billing address. The subject of the purchase refers to the notation in the "Subject" column in the PayPal transactional records listed below.

33. The PayPal accounts that ICE agents utilized to make the undercover transactions described above are as follows (listed by the business name that accompanied the account, the primary e-mail address that was associated with the account and any alternate e-mail addresses associated with the account):

14

| Business Name | Primary E-mail Address | Alternate E-mail Addresses |
|---|---|---|
| Proof Soft | androdork@gmail.com | androdork@yahoo.com<br>bsbsoft8@yahoo.com |
| Lencomps LTD | zakiyyah777@yahoo.com | lencomps@juno.com |
| Proof Soft | a_chakin@yahoo.com | |
| Belfast LTD | belfastltd@juno.com | caly@phoenixorder.com<br>emhigh@charter.net |
| Belfast LTD | lag89@nc.rr.com | belfast-limited@juno.com |
| Financial Services | belfast_ltd@juno.com | MMcCary3401@charter.net<br>Financialservice@charter.net |
| Proof Soft | pallone21@gmail.com | softprf@yahoo.com |
| Bullet Proof Soft | rrpay@hotmail.com | freewash130@yahoo.com<br>bklnchicano@yahoo.com |
| Bullet Proof Soft | PReyes1101@hotmail.com | bs_soft66@yahoo.com<br>bsofteawh@yahoo.com<br>phillip_reyes2001@yahoo.com |
| Bullet Proof Soft | mr.corax@gmail.com | venusdemi1023@aol.com<br>freeawh@yahoo.com |
| Bullet Proof Soft | bsb22flash@yahoo.com | oldervera@gmail.com |
| Lencomps LTD | itstime2change@hotmail.com | lencompsltd@juno.com |
| Jfire Financial | jufire@yahoo.com | a_service@freeawh.com<br>a_service@yahoo.com<br>jufire@hotmail.com<br>jufire@collegeclub.com<br>a_soft_tm@yahoo.com |
| S_Market | webfs@email.com | al_softm@yahoo.com<br>al_soft_tm@yahoo.com |
| CS S'ven Enterprise | belfast_limited@juno.com | Carlos_Sumpter@charter.net |

34.    As discussed in paragraph 31, ICE agents have conducted over 175 undercover

15

transactions during the course of this investigation. The undercover transactions have identified a group of PayPal accounts that are being used to facilitate customer payments to specific child exploitation member-restricted websites. Those specific member-restricted websites could be identified in the PayPal transactional records by looking to the description in the "Subject" column – the name associated with the particular child pornography website that the customer was purchasing access to. The names in this Subject column – referencing particular member-restricted websites – matched the names of the "website identifiers" that ICE agents received after they had entered their personal identifying information into the iWest payment system, during the instances in their investigation when the agents paid to access the member-restricted websites.

In addition to description in the Subject column, for each specific member-restricted website, the criminal organization assigned a unique Item ID number. These Item ID numbers also appeared in the PayPal transactional records. Those Item ID numbers corresponding to particular member-restricted websites matched the "Item/Product Numbers" contained in the receipt that ICE agents received from PayPal, after those agents had paid to access the member-restricted websites during their investigation.

Toward the end of November 2006, the criminal organization stopped using the listed descriptions in the Subject column to identify the specific member-restricted websites that were associated with each purchase. Therefore, for customer purchases before that point in November 2006, PayPal transactional records included both a description in the Subject column listing the particular member-restricted website that a customer was paying to access, as well as an Item ID number corresponding to that same website. For purchases after this point in November 2006,

16

only the Item ID number associated with the member-restricted website will be present in the

PayPal transactional records. The following descriptions were either extracted from the Subject

column from the PayPal transactional records or from the website identifier provided to ICE

agents on the iWest payment system. They were then matched with the Item ID number that was

associated with that same website during the ICE undercover transactions:

| Subject Description | Item ID Number |
| --- | --- |
| Home Collection 1000/Sexy Angels | 1000 |
| Home Collection 1001/Desired Angels | 1001 |
| Home Collection 1002 | 1002 |
| SickCR Package v5.06 Build 3638 | 1003 |
| DarkRO XP Tools v2.04 | 1004 |
| Underage Home | 1005 |
| Angel Collection 1006/Lolita Play | 1006 |
| Angel Collection 1007 | 1007 |
| Angel Collection 1010 | 1010 |
| HL Package/Hardlovers | 1012 |
| RH Collection | 1013 |
| FD2 Collections | 1014 |
| GOL-2 Collections | 1016 |
| EXTRA Collections | 1017 |
| LOH Collections | 1018 |
| LOPAR Collections | 1019 |
| NYMST Collections | 1020 |

| | |
|---|---|
| Secret Collections | 1021 |
| Lo Editions 3/4 Collections | 1026 |
| BD Hot Collections | 1029 |
| BD-Photo Collections | 1030 |
| Lust Collections | 1034 |
| Red Vids 1 | 1035 |
| Red Vids 2 | 1036 |
| Secret Content 2 | 1037 |
| Shadow Com | 1038 |
| Charming | 1047 |
| Gentle Angels | 1049 |
| Video Nymphets | 1121 |
| Lo Video-2 Collections | 1126 |
| Pretty X-2 Collections | 1128 |
| Under Info-2 Collections | 1129 |
| Lo Editions 7/8 Collections | 1132 |
| BDM 1-4 Collections | 1135 |
| Phang Collections | 1138 |
| Spycam Lolitas | 1144 |
| Boys Say Go | 1156 |
| LS Pics v1.0 | 1158 |
| Video Shop CD1 | 1159 |
| Video Shop CD2 | 1160 |
| Video Shop CD3 | 1161 |
| Video Shop CD4 | 1162 |

| Video Shop CD5 | 1163 |
|---|---|
| Kidz Index | 1177 |
| Kinder Schutz Web | 1183 |
| Lolitas Mixed | 1193 |
| CP City | 1202 |
| Extreme Material | 1215 |
| Excited Angles | 1218 |
| CP Home Video | 1222 |
| Pedoland-Kidz Porn | 1224 |
| Kidz Index | 1227 |

## THE SUBJECT OF THIS SEARCH WARRANT

35. Analysis of the transactional records obtained from PayPal provided the name and billing address of various customers that purchased access to at least one of the identified child pornography member-restricted websites, including the subject of this search warrant, John E. MANNING.

36. On October 27, 2006, at approximately 6:18 p.m., John E. MANNING made a payment of $99.95 to a PayPal account identified by the primary e-mail address lencomps@juno.com, for access to a child exploitation member-restricted website. As noted in paragraph 33, this PayPal account is one of the accounts that ICE agents utilized to purchase access to member-restricted websites during their investigation. The PayPal transactional records for that transaction provided the following relevant information:

**Date**: October 27, 2006

19

**Time**: 18:18:18 PST

**Name**: John MANNING

**Subject**: Home Collection 1002 30 Days Access

**Other IP**: 68.82.20.153

**Gross**: $99.95

**From E-mail Address**: ████████@hotmail.com

**To E-mail Address**: lencomps@juno.com

**Shipping Address**: ████████████████████, Wilmington, Delaware 19806

**Item ID**: 1002 – Home Collection 1002 30 days access

**Referral URL**: http://feaqareqqmg.net/join/index.php?action=procced_info&id=8591&
key=f92beb7411a4695f53b5b321b7b05803

**First Name**: John

**Last Name**: Manning

**Primary E-mail**: ████████@hotmail.com

**Primary Address**: 2302 Riddle Avenue, Unit 403, Wilmington, Delaware 19806

**Night Phone**: 302████████

Thus, the PayPal transactional records indicate that the payment was to purchase access

to a website identified by the Subject column description of "Home Collection 1002" and by the

Item ID number 1002.

37.    As previously noted, in the over 175 undercover transactions that ICE agents have

conducted during the course of this investigation, the agents have identified specific Subject

descriptions (reflected in the Subject column of the seller's PayPal transactional records) and

20

Item IDs that are associated with child exploitation member-restricted websites. As described in

paragraph 34, the Item ID number 1002 refers to a child exploitation member-restricted website

known as "Home Collection 1002." ICE agents purchased access to this member-restricted

website on the following dates: November 8, 2006, November 13, 2006, November 16, 2006,

December 26, 2006, January 16, 2007, January 19, 2007, January 26, 2007, March 7, 2007,

March 21, 2007 and April 5, 2007. These purchases began just after the October 27, 2006 date

when John E. MANNING purchased access to the website. On each of the occasions when ICE

agents purchased access, the transaction was either identified by the website identifier "Home

Collection 1002" and/or by the "Item/Product Number" 1002.

38.     As indicated in paragraph 36, the PayPal transactional records for John E.

MANNING contained a referring URL of:

http://feaqareqqmg.net/join/index.php?action=procced_info&id=8591&key=f92beb7411a4695f5

3b5b321b7b05803

This referring URL indicates the website that the customer was viewing immediately

prior to connecting to the PayPal payment page. ICE/C3/CES extracted the domain name for

every URL identified in the subject seller PayPal accounts. For example, from the above-

referenced URL, the domain name "feaqareqqmg.net" was extracted and provided to the

National Center for Missing and Exploited Children ("NCMEC"). NCMEC was able to query

their cybertipline databases and was able to verify that this domain name had previously been

reported to NCMEC and, when it was previously accessed by NCMEC, the website at that

domain name contained child pornography images.

21

Your affiant has also reviewed the advertising website affiliated with the member-restricted website Home Collection 1002, which was captured by ICE agents during the course of their transactions in the investigation. This advertising website is located at URL: http://moanoniysmy.net.com. This site has a banner across the top with the phrases "School Backyard" and "All of Boys and Girls". The site states that it offers "Not Only Usual Materials But Homemade Videos and Hidden Cameras." This site has several sections of photographs and videos of pre-pubescent children in which the children are either in provocative poses or are engaging in various sexual positions with adults. The site also has descriptions of videos of minor children (10-12 years of age) engaged in sexual acts. On the site, the individual has the option to make purchases via credit card billing through clicking a "Join" button. The majority of the sections and photographs on the webpage depict pre-pubescent naked minors in provocative poses. In many of these poses the genitalia of the minors is visible.

39.     During their investigation, ICE agents also captured the content of the member-restricted website with the Subject description "Home Collection 1002" (also known as "Home Collection CP Archive") that John E. MANNING purchased access to on October 27, 2006. You affiant has reviewed that website. The website contained the following sections: "News;" "Photos;" "Videos;" and "Software." There were numerous galleries contained within the "Videos" section. The video files, which could be downloaded by a customer, depicted child pornography, in that they depicted female minors engaged in sexually explicit conduct with adult males. The "Photos" section contained one gallery with approximately 19 images. Several of the images in this section, which could also be downloaded by a customer, contained child pornography as well, in that they depicted the lascivious display of the genitalia of female

22

minors. The following image descriptions provide a sample of the content of the member-

restricted website:

> ### Image 014:
> (http://homecollection.freeawh.com/members) (photos/retro/image014)
> This image displays a pre-pubescent female minor in what appears to be a
> shower. The female minor is urinating onto the shower floor. There is a clear
> display of her vagina.
>
> ### Video b7:
> (http://homecollection.freeawh.com/members) (videos/0002/b7)
> This video depicts a nude pre-pubescent female minor engaged in oral copulation
> with an adult male. The video is approximately 30 seconds in length. The female
> minor is lying on the adult male's stomach with her right arm by the adult male's
> side. It appears that she has one leg over each of the adult male's shoulders.
>
> ### Video b14:
> (http://homecollection.freeawh.com/members) (videos/0004/b14)
> This video depicts a nude pre-pubescent female minor engaged in sexual
> intercourse with a nude adult male. The video is approximately 46 seconds in
> length. The video begins with the adult male attempting to push his penis into the
> female minor's vagina while the female minor is lying on her back. The next
> screens show the adult male sitting on a couch with the female minor straddling
> his legs. He is holding the female minor and his penis is partially in the female
> minor's vagina.

40.    On or about July 11, 2007, a federal grand jury subpoena was served on the

Microsoft Corporation for subscriber information relating to the e-mail address

███████@hotmail.com – the e-mail address that John E. MANNING entered into the PayPal

website on October 27, 2006 when purchasing access to the Home Collection 1002 child

pornography member-restricted website. The subpoena revealed that the e-mail address

███████@hotmail.com was registered to a John MANNING, with a listed address of ███████

███████████████████████, Wilmington, Delaware 19806. This account was opened

September 21, 2002.

41. On September 5, 2007, your affiant checked Accurint.com, a law enforcement

23

database that contains information regarding an individual's current and prior addresses, their

neighbors and other biographical information. This database listed a former address of John

MANNING as ███████████████████, Wilmington, Delaware 19806. The

database also listed a current address as the Subject Premises: ████████████████

Wilmington, Delaware 19806.

42. A check with the Delaware Criminal Justice Information System ("DELJIS") on or

about June 21, 2007 and again on October 11, 2007, revealed a Delaware Drivers License

(Operator License Number ██████ for an individual named John E. MANNING who resides at

the Subject Premises: ██████████████Wilmington, Delaware 19806.

43. On or about July 25, 2007 and again on October 11, 2007, representatives of the

United States Postal Service informed ICE agents that John E. MANNING is currently receiving

mail at the Subject Premises: ████████████████, Wilmington, Delaware 19806.

44. Based on my previous investigative experience related to child pornography

investigations, including investigations of subjects who subscribed to websites offering access to

child pornography, I have learned that individuals who subscribe to such websites are often

individuals who have a sexual interest in children and in images of children, and who download

images and videos of child pornography. Based upon my knowledge, experience, and training in

child pornography investigations, and the training and experience of other law enforcement

officers with whom I have had discussions, there are certain characteristics common to

individuals involved in the receipt and collection of child pornography:

a.      Individuals who have a sexual interest in children or images of children may

receive sexual gratification, stimulation, and satisfaction from contact with children; or from

24

fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.    Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials involving children in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Individuals who have a sexual interest in children or images of children almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These individuals usually place high value on such materials because of the difficulty, and legal and social danger, associated with acquiring them. As a result, it is not uncommon for them to retain child pornography for long periods of time, even for years. Collectors of child pornography images often discard those images only while "culling" their collections to improve their overall quality.

d.    Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often

25

maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which the individual values highly.

e.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.    Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## CONCLUSION

45. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that John E. MANNING has engaged in criminal violations of 18 U.S.C. §§ 2252 and 2252A, including the possession and/or receipt of child pornography, and that evidence, fruits, and instrumentalities of criminal violations of 18 U.S.C. §§ 2252 and 2252A may be located at the residence described in Attachment A.

26

46. I, therefore, respectfully request that attached warrant be issued authorizing the

search and seizure of the items listed in Attachment B.

Patrick M. McCall
Special Agent
U.S. Immigration & Customs Enforcement


SUBSCRIBED and SWORN
before me this 22nd day of ____Octbr____, 2007


The Honorable Leonard P. Stark
United States Magistrate Judge

27

## **ATTACHMENT A:**

## **DESCRIPTION OF LOCATION TO BE SEARCHED**

The residence located at:



Wilmington, Delaware 19806

████████████████ is a four-story brick apartment building with a tan brick front

located on ██████████ in Wilmington, Delaware.  The building is part of the ███████

████████.  The numbers "████" are visible in black letters to the left of the door entrance.

Apartment #██ is located on the █████ floor within this building.

28

**ATTACHMENT B:**

**DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED**

The following is a description of the items evidencing violations of Title 18, United

States Code, Sections 2252 and 2252A to be searched for and seized, pursuant to the attached

search warrant. The seizure and search of computers and computer media will be conducted in

accordance with the process described in the affidavit submitted in support of this warrant:

a. images of child pornography, files containing images of child pornography in any form, and

records or materials relating to such images, including the images discussed in this affidavit,

wherever they may be stored or found, including, but not limited to:

      i.        any computer, computer system and related peripherals; tapes, cassettes,

cartridges, streaming tape, commercial software and hardware, computer disks, disk

drives, monitors, computer printers, modems, tape drives, disk application programs, data

disks, system disk operating systems, magnetic media floppy disks, hardware and

software operating manuals, tape systems and hard drive and other computer-related

operation equipment, digital cameras, scanners, computer photographs, Graphic

Interchange formats and/or photographs, undeveloped photographic film, slides, and

other visual depictions of such Graphic Interchange formats (including, but not limited

to, JPG, GIF, TIF, AVI, and MPEG), any electronic data storage devices (including, but

not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash

memory devices, and other storage mediums), and input/output peripheral devices

(including but not limited to passwords, data security devices and related documentation)

any hardware/software manuals related to or used to visually depict child pornography, to

contain information pertaining to the interest in child pornography; and/or to distribute, receive, or possess child pornography, as well as information pertaining to an interest in child pornography;

ii.     books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

iii.     originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

iv.     motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

b.  information or correspondence pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

i.     envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

ii.     books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as

30

defined in 18 U.S.C. § 2256;

c. credit card information, including but not limited to bills and payment records, such as records of payments discussed in this affidavit;

d. records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence; and

e. records or other items which evidence ownership or use of computer equipment or activity found in the above residence, including, but not limited to, sales receipts, bills or records regarding procurement of Internet access, records regarding accounts held with ISPs, and handwritten notes.